**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

| | |
|---|---|
| In re: . | |
| . | Chapter 11 |
| ACTRADE FINANCIAL TECHNOLOGIES, LTD., . | |
| et al., . | Case No. 02-16212 (ALG) |
| . | Jointly Administered |
| Debtors. . | |

----------------------------------------------------------------x

| | |
|---|---|
| THE ACTRADE LIQUIDATION TRUST, as . | |
| successors in interest to ACTRADE CAPITAL INC.,. | |
| and KENNETH P. SILVERMAN, as Chapter 7 . | |
| Trustee of the Estate of ALLOU DISTRIBUTORS, . | |
| INC., . | |
| Plaintiffs, . | |
| . | |
| -against- . | Adv. No. 09-01196 (ALG) |
| . | |
| GREENWICH INSURANCE COMPANY, XL . | |
| REINSURANCE AMERICA (f/k/a NAC . | |
| REINSURANCE CORPORATION), and GREAT . | |
| AMERICAN INSURANCE COMPANY, . | |
| Defendants. . | |

----------------------------------------------------------------x

## <u>POST-TRIAL MEMORANDUM OF OPINION</u>

APPEARANCES:

SALISBURY & RYAN LLP
Counsel to Actrade Liquidation Trust
1325 Avenue of the Americas
New York, New York 10019
    By:   Patrick P. Salisbury, Esq.
          George B. Schwab, Esq.

SILVERMAN ACAMPORA, LLP
Counsel to Chapter 7 Trustee of Allou Distributors, Inc.
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
    By:  Edward M. Flint, Esq.

WOLFF & SAMSON PC
Counsel to Defendants
One Boland Drive
West Orange, New Jersey 07052
    By:   Kenneth Laptook, Esq.
           Andrew S. Kent, Esq.

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

## <u>INTRODUCTION</u>

Actrade Capital, Inc., one of the above-captioned debtors ("Actrade"), filed for relief under Chapter 11 of the Bankruptcy Code on December 12, 2002, and confirmed a plan of liquidation on January 7, 2004. The largest claim in the Actrade case was filed by the Chapter 7 Trustee (the "Allou Trustee") of Allou Distributors, Inc. ("Allou"), another debtor then and now in liquidation proceedings in the Eastern District of New York, Case No. 03-8232 (ESS). The Allou claim charges that $48 million in payments made by Allou to Actrade were fraudulent conveyances under the Bankruptcy Code and under applicable state law (the "Allou Claim"). The Allou Claim was converted into an adversary proceeding and, after a period of litigation, the Actrade Liquidation Trust, successor-in-interest to Actrade, and the Allou Trustee (together, "Plaintiffs") entered into a settlement agreement (the "Allou Settlement").

The Allou Settlement provided for a settlement of the Allou Claim for $14 million. It was a condition of the Allou Settlement that Actrade obtain said sum from sureties that had issued payment bonds that protected Actrade in the event Allou did not satisfy its obligations to Actrade. The sureties include Greenwich Insurance Company ("Greenwich"), XL Reinsurance America ("XL") (together, the "Sureties") and the Great

American Insurance Company (collectively with the Sureties, "Defendants").[1]  This

Court approved the Allou Settlement by order dated June 16, 2009, but without prejudice

to the Defendants' rights to contest liability on the bonds.  The Actrade Liquidation Trust

and the Allou Trustee thereafter jointly filed this adversary proceeding on May 12, 2009,

seeking a declaratory judgment that the Defendants are liable on bonds aggregating $14

million that they had issued in favor of Actrade (as obligee) and on behalf of Allou (as

principal).  The Defendants asserted a number of defenses, including (with respect to

Greenwich and XL) that Actrade had released them from all claims in connection with a

prior settlement.  On September 18, 2009, this Court denied the parties' cross-motions for

summary judgment on the defense of release, and the parties proceeded to trial, at which

the sole issue was the viability of the release defense.

Based on the following findings of fact and conclusions of law, the Court

determines that the Sureties' defense of release does not bar Plaintiffs' action.

## THE FACTS ESTABLISHED AT TRIAL

The Court held a two-day trial on the construction of the release invoked by the

Sureties.  The Sureties called five witnesses.  Two were from Avalon Risk Associates

("Avalon"), an insurance agency authorized to issue surety bonds in the name of

Greenwich throughout the United States, either directly or through brokers, to handle

claims in connection with the bonds, and to bill and collect premiums and fees.[2]  The two

---

[1] The complaint names Great American Insurance Company ("Great American") as a third defendant and
sought similar relief with respect to a bond issued by Great American for Allou, as principal, and for the
benefit of Actrade, as obligee.  The matter now before the Court relates only to the defense asserted by
Greenwich and XL, and does not involve Great American.

[2] Avalon was appointed the exclusive general agent for Greenwich pursuant to a general agency agreement
between Greenwich and Avalon dated March 19, 1999 (the "GAA").  Section 6.1 of the GAA provides that
"all sums collected by Avalon on behalf of [Greenwich] shall be promptly deposited and held by Avalon in
a fiduciary capacity for the benefit of [Greenwich]."  (Plaintiffs' Exhibit 15.)  Section 6.3 provides that
Avalon could withdraw from the premium trust account an amount equal to commissions due to it by

3

Avalon witnesses were Ronald E. Wiss ("Wiss"), a former practicing attorney and vice president of Avalon in charge of the Actrade relationship, and Scott Mitchell Adams ("Adams"), president and principal owner of Avalon.  The Sureties also called Wayne D. Lambert ("Lambert"), a claims adjuster at Forcon International and later Cashin, Spinelli & Ferretti, LLC ("CSF"), which replaced Avalon in 2006 as claims adjuster for surety bonds issued by Greenwich; Karen Gilman ("Gilman"), attorney for the Sureties in connection with the settlement relied on by the Sureties; and Jonah Meer ("Meer"), trustee of the Actrade Liquidation Trust and representative of the Plaintiffs.  Plaintiffs did not call any witnesses.  The parties also introduced deposition testimony from Wiss, Adams, Lambert, Gilman, Meer, and Richard McCormick ("McCormick"), Actrade's former senior executive, as well as Jeffrey Marell and Jeffrey Saferstein, attorneys at Paul Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") who represented Actrade at the relevant time.

## I.    The Parties

Actrade was a public company that provided short-term financing to buyers and sellers of goods through a "Trade Acceptance Draft" program (the "TAD Program").  Instead of buying goods on credit, or issuing a post-dated check, a buyer would obtain from Actrade and issue to the seller a TAD, an instrument (allegedly similar to a check) equal in value to the full amount of the invoice price for the goods plus Actrade's commission on the transaction.  The seller would assign or tender the TAD to Actrade, and Actrade would pay the seller the invoice amount (the face amount of the TAD less

---

Greenwich, and further states that "the privilege of deducting commissions from premium monies received by Avalon as authorized by this Agreement shall not be construed as an alteration of Avalon's fiduciary capacity." (*Id.*)  Avalon apparently performed the same function for Greenwich's affiliate, XL, which issued some of the bonds in question.

Actrade's commission).  Upon maturity of the TAD, its face amount (including Actrade's commission) would automatically be debited from the buyer's bank account and deposited into Actrade's account.  The typical maturity date for a TAD was one month after payment was made to the seller.[3]

One of Actrade's customers was Allou, which purported to be a nationwide distributor of health and beauty aids, pharmaceuticals, fragrances and cosmetics.  The Allou Trustee's claim against Actrade alleges that $48 million of payments made by Allou to Actrade in repayment of TADs were avoidable fraudulent conveyances.  The above-described settlement between Actrade and the Allou Trustee states that Allou's claims are not predicated on a finding that Actrade knowingly participated in the Allou fraud or knew that Allou was purporting to purchase goods that never existed.[4]  The Allou Trustee's claims are more generally predicated on the contention that Allou's payment to Actrade on an invoice from one of Allou's alleged suppliers—an invoice that Actrade had discounted in the TAD program—was not for reasonably equivalent value because the invoice was fraudulent, created by an Allou affiliate, and that it represented goods that never existed.

The Sureties are engaged in the business of providing surety bonds in connection with various commercial transactions.[5]  Greenwich and its affiliate XL issued bonds

---

[3] The TAD program is described in further detail in this Court's opinion dated June 24, 2005, *In re Actrade Financial Technologies, Ltd.*, 337 B.R. 791 (Bankr. S.D.N.Y. 2005), denying Actrade's motion to dismiss the Allou Trustee's complaint.  The opinion discusses some of the other legal issues relevant to the underlying dispute between Actrade and Allou.

[4] The Allou Trustee has alleged that Allou used the TAD program to assist it in fraudulently inflating its inventory and accounts receivable and borrowing base, and that Actrade's middle-man position assisted Allou in concealing the transactions from Allou's creditors.  The Sureties have alleged that Actrade aided its customers' wrongdoing and have raised fraud as one of their many defenses to liability.

[5] Surety bonds are generally written contracts pursuant to which a licensed financial entity guarantees the performance by another party (the "principal") of a contract or other obligation in favor of a third party (the

aggregating at least $14 million (the "Allou Bonds") in favor of Actrade guaranteeing

payment by Allou on its TADs.  The Allou Bonds required the Sureties to pay (i) if Allou

failed to "make payment in full of the face amount of any TAD" when such amount

became due, or (ii) if "any prior payment made to Obligee [Actrade] is recovered from

the Obligee pursuant to the Bankruptcy, insolvency or similar law in accordance with an

order of as [sic] court of competent jurisdiction…."[6] Thus, the Sureties were liable under

the Allou Bonds not only if Allou failed to make payment when due, but also if a

payment made by Allou was recovered as an avoidable preference or fraudulent

conveyance in connection with a bankruptcy or similar proceeding involving Allou.

## II.    The AmPad and PUSA Transactions

The Sureties also issued other bonds in favor of Actrade, guaranteeing payment

by other parties in Actrade's TAD Program.  Two of these are central to the issues for

decision, bonds issued by the Sureties in support of the obligations of Pacific USA

Holdings Corp. and Pacific Realty Group, Inc. (collectively, "PUSA" and the "PUSA

Bonds"); and bonds issued in support of the obligations of Pad and Paper of America,

LLC ("AmPad" and the "AmPad Bonds").[7]

AmPad, a paper company, and PUSA, a real estate company, began

experiencing difficulties repaying their TADs in mid-2001 and late 2002, respectively.

Actrade claimed against the Sureties on the relevant bonds, and the Sureties commenced

an investigation of the claims.  In October 2001, representatives of Actrade and AmPad

met with Adams and Wiss on behalf of the Sureties to discuss the AmPad claim.  Wiss

---

"obligee").  The principal, in turn, generally executes an indemnity agreement in favor of the surety to
cover any loss incurred by the surety in the event the principal defaults.
[6] Reference is to section A.3 of that certain bond dated March 24, 2000, issued by one of the Defendants.
The Bonds are slightly different, but the differences are not material for purposes of this Opinion.
[7] Allou did not conduct any business with, and was not connected to, these buyers.

testified at trial that at the meeting it was disclosed that Actrade and its then-president, Alex Stonkus ("Stonkus"), had knowingly allowed AmPad to use the TAD Program to create disguised inter-corporate loans rather than to finance regular commercial transactions. Adams testified that Richard Couzzi, Actrade's vice president, was present at the meeting and did not deny the allegations. Both Adams and Wiss testified that they began to doubt Actrade's integrity as a result of this meeting, and that later in 2002, Avalon obtained from Bank of America, AmPad's lead lender, invoices and other documents that they believed corroborated the allegations against Actrade.

Adams testified that he decided to withdraw Avalon and Greenwich from any business relationship with Actrade. He did not want to do business with Actrade because he believed, on the basis of the above allegations, that Actrade had acted dishonestly and had deceived Avalon and Greenwich about the legitimacy of the transactions for which the bonds had been issued. Adams thereafter sent a letter to Stonkus stating that Avalon had decided to withdraw from all Actrade-related transactions, and although Adams said he verbally informed Stonkus that he would discontinue the business relationship with Actrade due to the allegations against Actrade, in his letter, dated February 11, 2002, Adams only cited adverse market conditions. He testified that he felt it was more "gentlemanly" to not place his actual reasons for doing so in writing. (Defendants' Exhibit G-15; Tr. 245:3-246:7.)

Avalon thereafter also sent a letter to each of the principals on the Actrade-related Greenwich bonds, informing them that Greenwich was withdrawing from the business of providing bonds for Actrade-related transactions and allowing them a period of time to make alternate arrangements. Allou received one of these letters, and again the only

reason cited for the termination of the bonds was adverse market conditions.

(Defendants' Exhibit G-16.)

In the meantime, Actrade's business began to falter. The SEC launched an investigation relating to Actrade's publicly issued securities, and Actrade hired the Paul Weiss law firm to conduct an internal investigation. In early 2003, Adams was subpoenaed to testify in the investigation of Actrade and was questioned about aspects of the AmPad and PUSA transactions. He was subsequently subpoenaed to produce documents to the SEC.

### III.    The AmPad and PUSA Settlement

Both AmPad and PUSA filed for bankruptcy in 2002, leaving an aggregate of $24.5 million in TADs unpaid. Actrade filed claims with the Sureties under the AmPad and PUSA Bonds. Adams testified that in late 2002 he discussed the AmPad and PUSA transactions with McCormick, Actrade's president at the time, told McCormick that there were allegations of Actrade's fraudulent conduct in connection with the AmPad Bonds, and asserted that the "surety was going to reserve its rights…and its defenses under these transactions…that we felt fraud may have been involved in one or both of them; that that would be a valid defense under the bonds." (Tr. 249:16-24.) Nevertheless, Actrade, which was by then in its own Chapter 11 case, commenced separate adversary proceedings against the Sureties to recover under the AmPad and PUSA Bonds.[8]

Although Actrade's effort to collect from the Sureties on the AmPad and PUSA bonds was accompanied by accusations of wrongdoing on the part of Actrade, the Sureties did not take any discovery in defense of either adversary proceeding. Instead,

---

[8] Adv. No. 03-02070 (ALG) was filed on January 31, 2003 to recover the principal amount of $8.5 million on the AmPad Bonds, and Adv. No. 03-02068 (ALG) was also filed on January 31, 2003 to recover the principal amount of $16 million on the PUSA Bonds.

the Sureties entered into a six-week period of settlement negotiations that culminated on

May 9, 2003 in a settlement agreement (the "AmPad and PUSA Settlement" or

"Settlement").  During the negotiations, Gilman represented Greenwich and XL, and

Wiss acted as the principal business contact on behalf of the Sureties.  Lawyers at Paul

Weiss represented Actrade.

In March of 2003, the attorneys and representatives of Actrade and Greenwich

met at the offices of Paul Weiss and reached agreement on the essential business terms of

the settlement.  On April 3, 2003, Wiss sent a term sheet to Paul Weiss.  The term sheet

had two headings: "AmPad" and "Pacific Holdings".  Under the AmPad heading, the

term sheet proposed a payment of $1 million by Greenwich in return for which

"Greenwich will receive a release from Actrade of all claims under Greenwich's bonds of

$8 million and $500 thousand."  Under the Pacific Holdings heading, "Greenwich will

execute a note for $10.5 million payable without interest no later than October 1, 2003,

and Greenwich will receive a complete release of all claims on its bonds."  (Defendants'

Exhibit 31.)  The term sheet provided further that Actrade would "confirm that it timely

filed its proof of claim in the Ampad bankruptcy" and that "[u]pon the entry of final non-

appealable orders in Actrade's bankruptcy and Pacific's bankruptcy, Greenwich will

receive an assignment of the entire Actrade claim (assumes timely filed for about $19.5

million) in the Pacific bankruptcy."  (*Id.*)  There is no mention of any claims other than

those relating to the AmPad or PUSA bonds.

Gilman, counsel for Greenwich, prepared the first draft of the Settlement

agreement.  There is no dispute that this draft, like all subsequent drafts, contained a

clause providing for a mutual general release of *all* claims between the Sureties and

Actrade (the "Release").  On the other hand, no other part of the document contains any mention whatsoever of any transactions, bonds, or claims, except those relating to AmPad and PUSA.

Like the term sheet mentioned above and all subsequent versions of the AmPad and PUSA Settlement, the preamble of the Settlement defines the subject of the settlement as bonds "for" either AmPad or PUSA.  Paragraphs 3 and 4 require Actrade to return the AmPad and PUSA Bonds to the Sureties.  The consideration therefor is in paragraph 20, which lists an "Ampad Payment" of $1 million to be paid by Greenwich to Actrade, and a "PUSA Note" with a principal amount of $10.5 million to be executed and delivered by the Sureties in favor of Actrade.  Nowhere in the draft is there mention of any bonds, transactions, buyers, or claims other than those relating to AmPad and PUSA.

Gilman sent the first draft to Actrade's attorneys at Paul Weiss, after which the parties exchanged at least five drafts.  None of the drafts made reference to any bonds other than the AmPad and PUSA Bonds.  None referred to the existence of other transactions or to a global or general settlement – except that the release at all times was a general release of all claims.  The course of the settlement negotiations also makes it clear that Paul Weiss on behalf of Actrade reviewed the broad and unlimited release language proposed by the Sureties – and then broadened it further.  Thus, Gilman's first draft of the Settlement dated April 11, 2003, contained language that named the parties to be released from "any and all claims" by the Sureties as Actrade "and its estate."  In a responsive draft dated April 14, 2003, Paul Weiss added language that included as parties to be released Actrade's and the Sureties'

> respective and collective present, former and future affiliates, parents, subsidiaries, employees, officers, directors, associates, stockholders, owners,

partners, members, managing members, investors, lenders, investment bankers, accountants, insurers, agents, independent contractors, consultants, attorneys, and all of their respective and collective, present, former and future representatives, predecessors, successors and assigns…." (Defendants' Exhibit 34.)

Actrade continued to fine tune the parties and entities that were to be released by Greenwich and XL. In an April 15, 2003 e-mail (Exhibit G-35), just before the Settlement Agreement was finalized, Paul Weiss sent Gilman a list of 31 officers, directors and employees of Actrade and seven corporate entities that Actrade wanted named as releasees. These included, for example, Actrade Capital Canada, Inc., Actrade South America Ltd., Actrade Commerce Ltd., 25 "company employees" (including Couzzi) and 6 "company directors" (including McCormick). There is no evidence that any of these entities had any connection to the AmPad and PUSA Bonds.[9]

The Sureties and Actrade executed the final version of the Settlement containing the Release at issue herein on May 7 and May 9, 2003. Adams signed on behalf of Greenwich and XL, and McCormick signed on behalf of Actrade. The releases in paragraph 11 read as follows:

11.a. At the Effective Time, Actrade, on behalf of itself…hereby irrevocably and forever, fully and finally, remises, releases, acquits and discharges the Sureties, and all of their…successors and assigns, and any person or entity acting for or on behalf of the Sureties (collectively, the "Actrade Releasees")…of and from any and all claims, demands, rights, actions or causes of action…whether known or unknown, contingent or absolute…
b. At the Effective Time, each of the Sureties, on behalf of itself…hereby irrevocably and forever, fully and finally, remises, releases, acquits and discharges Actrade…and all of their…former and future successors and assigns (collectively, the "Surety Releasees"), of and from any and all claims, demands, rights, actions or causes of action…whether known or unknown, contingent or absolute… (Defendants' Exhibit G-39.)

---

[9] In an affidavit submitted in connection with Actrade's Chapter 11 filing (Docket # 8), McCormick averred that Actrade had "conducted an international bill of exchange business referred to herein as International Merchandise Trade Business or MIT Business . . ." through certain subsidiaries, including Actrade Capital Canada, Inc., Actrade South America, Limited and Actrade Commerce Limited.

The only trial testimony regarding the Settlement was from the Sureties.  At trial and in deposition testimony, admitted into evidence, Adams testified that his goal was to arrive at a mutually agreeable settlement that would remove Avalon and Greenwich from any and all connection to Actrade.  Wiss similarly stated that he "wanted in the end just a clean break…" (Tr. 90:9-91:4), and that he had instructed Gilman to prepare a first draft of the Settlement containing a mutual general release.  Gilman testified that she understood and intended the release language not to be limited to the AmPad and PUSA Bonds, but that it was intended to cover "anything."  (Tr. 324:9-15; 328:2-329:21)  On the other hand, there was no evidence at trial of any discussion between the parties of a general release.  Wiss testified that there was no discussion of the Release "at all" at the meeting with Paul Weiss in March 2003.  (Tr. 81:8-12)  Gilman, counsel for Greenwich, could not recall stating that it was Greenwich's intent to obtain a release covering liabilities on all bonds, other than through the drafting.  Adams admitted that he never told Actrade of his intent to obtain a broad release.  While Wiss said that a discussion about the Release occurred at some point, he could not recall when it occurred or what was said.  There was also no evidence that the Sureties attempted to quantify the amount of outstanding liability on Actrade bonds unrelated to AmPad or PUSA.

Actrade did not produce any witnesses at trial.  When deposed before trial, McCormick and the Paul Weiss lawyers who were involved on behalf of Actrade said they had no recollection regarding the Release.

## IV.    The Motion to Approve the AmPad and PUSA Settlement

Actrade moved before this Court on June 2, 2003, to approve the AmPad and PUSA Settlement pursuant to Bankruptcy Rule 9019.  The Actrade motion, like the

Settlement, describes the AmPad and PUSA Bonds issued by Greenwich and XL,

defining them as the "Bonds." (Defendants' Exhibit G-40.)  The motion also describes

the defaults and bankruptcy filings by AmPad and PUSA, the claims filed by Actrade in

the AmPad and PUSA bankruptcies, and the AmPad and PUSA adversary proceedings.

Like the Settlement, the motion makes no mention of any bonds or disputes except those

related to AmPad and PUSA, and it contains no indication that there were any other

transactions between the parties.

On June 9, 2003, the committee representing the Actrade shareholders objected to

the Settlement, claiming that the settlement amount was too low.[10]  The Sureties re-

negotiated the amount, increasing the principal amount of the PUSA promissory note

from the Sureties in favor of Actrade from $10.5 million to $12 million, and the

committee withdrew its objection.  This Court approved the Settlement on June 24, 2003.

## V.   Post Settlement Events

Several events subsequent to the approval of the AmPad and PUSA Settlement

are relevant to the issues at bar.

### A.  The WDF Claim

On September 8, 2003, four months after the Release was signed, and less than

three months after approval of the AmPad and PUSA Settlement, Gilman, at the direction

of Wiss, filed a proof of claim in the Actrade bankruptcy case for a premium that was

unrelated to either AmPad or PUSA (the "WDF Proof of Claim").  The WDF Proof of

Claim asserted a pre-petition claim for an unpaid premium of $15,754 related to a bond

issued by Greenwich to Actrade on behalf of another principal, WDF, Inc. (the "WDF

---

[10] An official equity committee was formed in the Actrade Chapter 11 proceedings on May 13, 2003.
Actrade had a very small creditor body (the Allou Claim had not yet been filed), and it appeared at that
time that Actrade would be able to pay all creditors and that there would be a substantial return to equity.

Bond").  Under the general agency agreement between Avalon and Greenwich, all premiums belonged to Greenwich, not Avalon.  However, at the time the claim was filed, Avalon had pre-paid the amount of the premium to Greenwich, and it filed the WDF Proof of Claim in its own name.  It appears that Wiss had previously talked to an attorney at Paul Weiss about the matter, because on September 5, 2003, the attorney emailed Wiss that he had discussed the matter with McCormick, had the "complete picture," and concluded with the following position: "I think the two choices you have are as follows: (x) pursue WDF or (y) file a proof of claim (which is due Monday) in the Actrade bankruptcy in respect of what you think Actrade owes Avalon." (Ex. G-46.)

Avalon took the second option, and on February 20, 2004, attorneys for the Actrade Liquidation Trust filed an omnibus motion to expunge the WDF Proof of Claim based on the fact that Actrade's books and records did not show any amount owed.  The attorney for the Actrade Liquidation Trust, who had been counsel to the equity committee at the time of its objection to the Settlement, asked Gilman in a subsequent telephone conversation how Avalon could file a claim in the Actrade bankruptcy when the parties had executed mutual general releases.  Gilman responded that the claim was an Avalon claim and not a Greenwich claim and forwarded a copy of the Saferstein email quoted above, stating also that the parties should go on to "bigger & better things." Subsequently, the objection to the WDF Proof of Claim was withdrawn, and the Claim was paid when the bulk of Actrade's general unsecured claims were paid.

### B.     Allou Appears

The WDF Proof of Claim was filed on September 8, 2003.  On the same day, which was the Bar Date for filing proofs of claim against Actrade, Allou filed its first

claim in Actrade's bankruptcy case in the amount of $22.7 million.  This was Allou's initial appearance.  On July 26, 2004, after objections to the claim had been filed, the Allou Claim was converted to an adversary proceeding.  Thereafter, there were two contacts between Actrade and the Sureties relating to the Allou Claim that are relevant to the instant dispute.

First, counsel to Actrade's liquidation trustee at the time wrote to the Sureties on October 22, 2004, notifying them of the Allou adversary proceeding and enclosing a copy of the Allou complaint.  Actrade's letter was forwarded by Greenwich to Avalon for reply, and Wiss received and reviewed the letter.  Wiss responded on behalf of the Sureties on November 1, 2004.  He acknowledged receipt of the letter, alluded to the fact that any claim by Actrade on the Allou Bonds was only a "potential claim" and that a formal claim against the Sureties had not yet been made by Actrade, and asserted that Allou's allegations that Actrade had knowingly participated in Allou's fraud barred payment under the Allou Bonds.  Wiss did not mention the AmPad and PUSA Release or cite it as a bar to all claims.  At trial, Wiss testified that he did not raise the Release as a defense because in November 2004, eighteen months after the Settlement, he simply did not remember the terms of the Release.

The second contact took place in 2006 when Actrade's successor liquidation trustee and his counsel called Wiss on two occasions.  By that time, Greenwich had terminated Avalon's authority to write new bonds, and Lambert of CSF had replaced Wiss as claims adjuster on the surety bonds issued by Avalon for Greenwich.  All of Avalon's files, including those relating to the AmPad and PUSA Bonds, had been transferred from Avalon to CSF.  Actrade representatives, however, were not aware of

the transfer of the claims adjusting responsibilities, and they called Wiss to discuss the

Allou situation.  In both calls they invited Greenwich to become involved in the Allou

case and settlement discussions.  Wiss responded by confirming that Actrade had not

filed a formal claim to which the Sureties would have to provide a formal response.  As

he did in 2004, he raised the allegations of past fraudulent conduct by Actrade, but again

failed to raise the issue of a release.

Wiss e-mailed Lambert after the last phone call with Actrade representatives to

warn him that the Allou "file has come back to life with a telephone call." (Defendants'

Exhibit G-60.)  Again, Wiss failed to mention the issue of a release.  Similarly, Adams

testified that neither he nor Wiss discussed the possibility that the Release barred the

potential Allou Claim, despite having generally discussed the potential Allou Claim

"several times" after October 22, 2004.  (Tr. 254:11-20)  Wiss explained during

deposition testimony that he had forgotten about the Release.  (Plaintiffs' Exhibit 46; Tr.

85:13-18)  The Sureties did not raise a defense based on the Release until they responded

to Plaintiffs' complaint in the spring of 2009.

### C.  Court's Decision on Summary Judgment

After the above-captioned adversary proceeding was commenced by Actrade

against the Sureties, both parties moved for summary judgment on the release issue.  The

Sureties argued that the language of the Release was clear on its face and that there was

no need to go any further.  Actrade relied on a principle of New York law that "[e]ven the

most broadly drawn general release cannot necessarily be taken at face value." *In re*

*Clinton Street Food Corp.*, 245 B.R. 523, 534 (Bankr. S.D.N.Y. 2000).[11]  Actrade also

argued that the Sureties were judicially estopped because the WDF Proof of Claim filed

in the Actrade case was inconsistent with the Sureties' current interpretation of the

Release.

The Court held on summary judgment that the language of the Release, when read

together with the rest of the Settlement Agreement, was ambiguous and that there was a

triable issue of fact with regard to the intent of the parties at the time the Release was

executed.  It held that the doctrine of judicial estoppel was not applicable because neither

the Sureties nor Plaintiffs had taken a position before the Court relating to the Release at

the time the WDF Proof of Claim was filed, and the Court had made no findings as to the

applicability or inapplicability of the Release to the proof of claim.  *See Uzdavines v.*

*Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005), *Stichting v. Schreiber*, 407 F.3d

34, 45 (2d Cir. 2005), and *In re Oneida, Ltd.*, 382 B.R. 29, 48 (Bankr. S.D.N.Y. 2008) (in

order to invoke judicial estoppel, a party's current position must be "clearly inconsistent"

with its earlier one, and the earlier position must have persuaded the Court to take certain

action).  The Court denied the parties' cross-motions for summary judgment in an oral

opinion on September 18, 2009, and the matter proceeded to trial.

## DISCUSSION

The Court's objective in a contract action is to give effect to the intention of the

parties as gleaned from the language of the contract itself.  *Metropolitan Life Ins. Co. v.*

*RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990), citing *Hartford Acc. & Indem. Co.*

*v. Wesolowski*, 33 N.Y.2d 169, 171-72, 350 N.Y.S.2d 895, 898, 305 N.E.2d 907, 910

---

[11] There is no dispute that New York law is applicable.  The pertinent events in this case, including the negotiation and execution of the release in question, occurred in New York.  Thus, New York law governs the Release.  *See Barrett v. United States*, 622 F. Supp. 574, 582 n.5 (S.D.N.Y. 1985).

(1973).  There is no question that the Release in paragraph 11 of the AmPad and PUSA Settlement employs language that is general and broad and when read in isolation covers *all* claims against the Sureties.  This general language would be conclusive but for the principle of New York law that a release, general on its face, will be limited to those claims within the contemplation of the parties at the time.  As stated by the New York Court of Appeals, "While it has been held that an unreformed general release will be given its full literal effect where it is directly or circumstantially evident that the purpose is to achieve a truly general settlement, the cases are many in which the release has been avoided with respect to uncontemplated transactions despite the generality of the language in the release form."  *Mangini v. McClurg*, 24 N.Y.2d 556, 562, 301 N.Y.S.2d 508, 249 N.E.2d 386 (1969).

As stated in *Mangini*, the New York cases in which a release has been limited and found not to cover unforeseen matters are in fact "many".  Cases cited by *Mangini* include *Cahill v. Regan*, 5 N.Y.2d 292, 184 N.Y.S.2d 348, 157 N.E.2d 505 (1959), where the Court held that "[a]lthough the effect of a general release, in the absence of fraud or mutual mistake, cannot be limited or curtailed…its meaning and coverage necessarily depend, as in the case of contracts generally, upon the controversy being settled and upon the purpose for which the release was actually given.  Certainly, a release may not be read to cover matters which the parties did not desire or intend to dispose of."  *Id.* at 299-300.  In *Cahill*, general releases were exchanged in a replevin action, and one party sought to apply them to a subsequent patent dispute.  The Court limited the releases to the matters in dispute at the time the releases were executed and, on this ground, declined to extend the general releases to the later patent action.

The *Mangini* Court also cited *Simon v. Simon*, 274 App. Div. 447, 84 N.Y.S.2d 307 (1st Dept. 1948), in which it was held that "[w]hether a release is to be treated as including all possible claims depends upon the purpose for which the release is given." *Id.* at 449. In *Simon*, the Court held that the parties sought to settle alimony claims and a claim by the plaintiff to a co-partnership interest when the parties executed the release. There was no dispute at the time as to the plaintiff's title to certain property. Although the release was general in form, the Court declined to bar any claims relating to such property. In addition, the *Mangini* Court cited *Haskell v. Miller*, 221 App. Div. 48, 222 N.Y.S. 619 (1st Dept. 1927), *affd,* 246 N.Y. 618, 159 N.E. 675 (1927), and *Rubinstein v. Rubinstein*, 109 N.Y.S.2d 725, 732 (Sup. Ct. N.Y. Co. 1951), *affd*, 279 App. Div. 1073, 113 N.Y.S.2d 277, *affd*, 305 N.Y. 746, 113 N.E.2d 149 (1953), where the Courts held that the fact that the settlement agreements contained recitals regarding particular claims limited the general words of a release to the claims that were within the parties' contemplation.

In a more recent case, *Lucent Technologies, Inc. v. Gateway, Inc.*, 470 F. Supp. 2d 1195 (S.D.Cal. 2007), the Court, applying New York law, considered a motion for summary judgment to dismiss an affirmative defense of release. There, a seller of telecommunications equipment sued a purchaser for patent infringement, and the purchaser argued that a release executed during an unrelated dispute over maintenance service overpayments barred the patent infringement claims. The release covered "any and all claims … demands … liabilities … rights of action and causes of action, of any kind or character whatsoever." The Court placed great weight on the context of the release in that case. It found that despite the facially broad language, the remaining

portions of the agreement established an unambiguous context, that the parties were concerned only with a dispute over maintenance service overpayments, and that the release could not be construed to cover the patent infringement claims later at issue. *Id.* at 1202.

In *Consol. Edison, Inc. v. Northeast Utilities*, 332 F. Supp. 2d 639 (S.D.N.Y 2004), the Court, applying New York law, similarly granted a motion for summary judgment dismissing the defense of release. The question was whether a release given in a prior action relating to different claims released ConEd from liability with respect to shareholder claims under a merger agreement. The Court held that the "scope of a release turns on the controversy being settled and the purpose for which the release was actually given." *Id.* at 647. The Court found it "inconceivable that sophisticated parties informed by counsel would bargain away such a claim without any monetary consideration, and the terms of the release cannot reasonably be read to require such a result." *Id.* at 649. Moreover, the Court noted a delay in ConEd's assertion of a release defense and found the "failure to raise the defense earlier [to be] persuasive evidence that the Settlement Agreement was never intended to affect this action…" *Id.* at 650-51. In *W. Alton Jones Found. v. Chevron U.S.A., Inc.*, 97 F.3d 29, 34 (2d Cir. 1996), the Court, applying New York law, similarly found that a litigant's "three and a half year delay in moving for judgment based on the settlement…is powerful evidence that [it] did not believe that the settlement barred the prosecution [of an ongoing state court action]."

In *Clinton Street Food Corp.*, 254 B.R. 523 (Bankr. S.D.N.Y. 2000), this Court, applying New York law, dealt with a release that was "[c]oncededly…quite broad, and look[ed] like it should embrace the Trustee's claims against [one of the defendants]…."

*Id.* at 534.  Although the "final WHEREAS clause in the stipulation indicates the intention to enter into a global release of all claims, not just the claims asserted in the pending lawsuit," the Court nevertheless concluded that:

> The general release was given in the context of the settlement of a specific and entirely unrelated action…Nothing in the stipulation or the record of the earlier lawsuit focuses on the specific issue in this litigation…This is not surprising.  The pending claims were unknown to the trustee and hence not the subject of a dispute at the time, making it less likely they are covered by the release.  In addition, it does not appear that the parties bargained over the auction claims, or that the estate received any additional consideration for releasing such potentially valuable claims.

*Id.* at 534-35.  Thus, the Court denied the defendant's motion to dismiss based on the defense of release.

Actrade relies on the foregoing line of cases in seeking to sustain its burden of demonstrating that the Release at issue is limited, notwithstanding its facially broad language.[12]  The facts on which Actrade most heavily relies are the context and entirety of the AmPad and PUSA Settlement Agreement as a whole, as well as the events that occurred after it was executed.  Those circumstances, and the impact they have on construing the Release at issue, are discussed below.

## I.    Context of the AmPad and PUSA Settlement

The facts of this case support, in most respects, Actrade's contention that the Release, while general in language, was intended to cover only the AmPad and PUSA Settlements.  Thus, in interpreting the scope of the Release, the Court must first begin with the context and entirety of the agreement as a whole.  "As a general matter of

---

[12] Under New York law, the party seeking to limit the scope of a release has the burden of proof on the issue.  As the Court said in *Mangini*, 24 N.Y.2d at 563, 301 N.Y.S.2d at 513-514, "the releasor, whether the issue arise in reformation or on construction of the instrument, must sustain the burden of persuasion if he is to establish that the general language of the release, valid on its face and properly executed, is to be limited because of a mutual mistake, or otherwise does not represent the intent of the parties."  *See also Kirchner v. New Home Sewing Mach. Co.*, 135 N.Y. 182, 31 N.E. 1104 (1892); *Mt. Read Terminal, Inc. v. LeChase Const. Corp.*, 58 App.Div.2d 1035, 396 N.Y.S.2d 959, 960 (4th Dept. 1977).

contract interpretation, the Settlement Agreement must be read 'as a whole, and every part will be interpreted in reference to the whole.'" *Consol. Edison v. Northeast Utilities*, 332 F. Supp. 2d at 647, quoting *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 794 N.E.2d 667, 670, 763 N.Y.S.2d 525 (2003). "New York law considers the context as a key factor in interpreting a release. Where the release presents a specific context, the released claims are interpreted in this light." *Lucent Technologies, Inc.*, 470 F. Supp. 2d at 1199.

In this case, the Settlement is replete with references to the AmPad and PUSA Bonds, and to those bonds only. The preamble on page 1 of the Settlement defines the bonds in the Settlement as bonds "for" either AmPad or PUSA, and paragraphs 3 and 4 require Actrade to return only the AmPad and PUSA Bonds to the Sureties. There is no mention of any "bonds" generally, a "global" or "general" release, general liability of the Sureties to Actrade, or any other buyers or claims. Paragraph 20 lists the "Ampad Payment" of $1 million to be paid by Greenwich and the "PUSA Note" of $10.5 million to be delivered by Greenwich to Actrade, indicating that the consideration furnished by the Sureties was specifically allocated to the AmPad and PUSA Bonds, respectively. Except for the broad release clause, the Settlement refers solely to a dispute between Actrade and the Sureties over the Sureties' liability on the Bonds, as defined, thereby establishing a context in which the parties dealt exclusively with the AmPad and PUSA Bonds.

The failure of the Settlement Agreement to refer to any disputes other than those relating to the AmPad and PUSA Bonds is consistent with all of the other documents exchanged between the parties. The initial term sheet refers only to AmPad and PUSA.

The motion for approval of the settlement similarly refers only to these claims and not to a general release of claims.

It is also a firm principle of New York law that it is less likely that claims are covered by a general release if they are unknown at the time of the release. *See Clinton Street Food Corp.*, 254 B.R. 523, 535 (Bankr. S.D.N.Y. 2000), citing *Enock v. Nat'l Westminister Bankcorp,* 226 App.Div.2d 235, 641 N.Y.S.2d 27, 28 (1st Dept. 1996).[13] The record is clear that the Allou Claim was not contemplated at the time the parties signed the Settlement, and that the parties did not contemplate even the possibility that a new claim could arise on another bond. The Allou Bonds had expired according to their terms at the time of the AmPad and PUSA Settlement. The Sureties' liability on the Allou Bonds is currently predicated exclusively on a clause in the bonds that reinstated liability in the event that any payment by Allou to Actrade was recovered by Allou in a bankruptcy or similar proceeding. Although Adams testified that he was "aware" of the possibility of tail liability under a bond that provided therefor, he admitted that the bankruptcy provision contained in the Allou Bond was unique to the Actrade bonds, and that Actrade was the only principal for which the provision was used. (Tr. 292:24-293:4) There is no question that the type of tail provision in the Actrade bond is an unusual one. (Tr. 292:24-293:4)

In any event, it appears from the record as a whole that the parties gave no thought to the possibility that the Sureties could have liability on any bonds other than

---

[13] State law on the release of unknown claims appears to be even more hostile in other jurisdictions. Under California law, for instance, "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor." *See* California Civil Code § 1542. "If the release specifically mentions unknown claims, independent evidence must demonstrate that the releasor intended to release unknown claims." *McCray v. Casual Corner, Inc.*, 812 F. Supp. 1046, 1048 (C.D.Cal. 1992), citing *Casey v. Proctor*, 59 Cal.2d 97, 28 Cal.Rptr. 307, 314, 378 P.2d 579, 586 (1963).

those relating to AmPad or PUSA.  Wiss, who was most closely involved in the

settlement negotiations, testified that he was "not aware" of any unpaid TADs when he

was negotiating the AmPad and PUSA Settlement, and that to his knowledge, "the bonds

had terminated late in 2002."  (Tr. 90:9-20.)  Adams testified that he never attempted to

ascertain the value of claims that would be released between Actrade and the Sureties

under a general release, other than those relating to AmPad and PUSA.  The record is

also bereft of any evidence that Actrade sought to quantify the claims it might be

releasing outside of the AmPad and PUSA Bonds under a general release.  It is difficult

to conclude that both Actrade and the Sureties, sophisticated parties represented by

sophisticated counsel, intended to compromise potential claims without making any

attempt to ascertain their value.  Failure to specifically refer to the release of claims other

than the AmPad and PUSA Bonds, as well as the overall context of the Settlement,

weighs in favor of a finding that the Release was not intended to be general.

Thus far, the facts of this matter fall squarely within the "many" New York cases

that limit even a broadly worded release to the matter contemplated by the parties.  There

are only two countervailing factors.  One is that Actrade's sophisticated counsel took a

general release provision contained in Gilman's first draft and made it even broader,

including as beneficiaries of the Release employees, officers, directors, associates, agents

and affiliates.  Further, in an April 15, 2003 e-mail, Paul Weiss sent Gilman a list of 31

named officers, directors, and employees of Actrade and 7 corporate entities that Actrade

wanted added as releasees.

The issue before the Court, however, is not the identity of the entities that are

entitled to the benefit of the Release contained in the AmPad and PUSA Settlement.

Rather, the issue is whether the Allou Claim or other unanticipated claims on other bonds were intended to be within the scope of the Settlement.  While it is clear that Actrade sought to widen the identity of the parties to be released, it does not follow that Actrade intended to widen the scope of claims to be released.

The second factor is that the Sureties argue that they were concerned about Actrade's ethics and wanted to be free of any involvement with Actrade.  At trial, the Sureties adduced testimony from Gilman, Wiss and Adams that they intended to sever all future relationship with Actrade.  There was no evidence, however, that any of them communicated this intent and understanding to Actrade or related it to the Release.  Their unstated goal does little to demonstrate the parties' *mutual* intent, as there is no indication of this intent in the AmPad or PUSA Settlement other than the Release clause itself.  The unexpressed subjective intent of one party is immaterial in construing the terms of a contract.  *Faulkner v. National Geographic Society*, 452 F. Supp. 2d 369, 377-378 (S.D.N.Y. 2006); *see also Lubrication & Maint., Inc. v. Union Res. Co.*, 522 F. Supp. 1078, 1081 (S.D.N.Y. 1981), stating that "[d]etermination of the intent of the parties at the time they entered into the contract is not governed by their unexpressed subjective views, but rather by what they wrote, their acts, conduct and all surrounding circumstances."  The Court must determine the intent of the parties by examining the entirety of the Settlement, the parties' acts, and all other conduct and surrounding circumstances that bear on this issue.  Based on the record as a whole and settled New York law, the Court finds that Actrade has satisfied its burden of establishing that the Release was limited to the claims contemplated by the parties in the AmPad and PUSA

Settlement, and that Actrade did not release unknown and uncontemplated claims on the Allou Bonds.[14]

## II.    Post Settlement Conduct

The foregoing conclusion is supported by the parties' conduct after the AmPad and PUSA Settlement was approved by the Court.  It is a well-accepted principle that "[t]he parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent." *Ocean Transp., Inc. v. Am. Phil. Fiber Indus.*, 743 F.2d 85, 91 (2d Cir. 1984), quoting *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913). Courts frequently examine events that take place subsequent to the execution of a contract to ascertain the original intent of the parties.  *See Marine Midland Bank-Southern v. Thurlow*, 53 N.Y.2d 381, 387, 442 N.Y.S.2d 417, 419-20, 425 N.E.2d 805 (1981); *Cantrade Private Bank Lausanne Ltd. v. Torresy*, 876 F. Supp. 564, 573 (S.D.N.Y. 1995); *see also In re Oneida, Ltd.*, 400 B.R. 384, 389-90 (Bankr. S.D.N.Y. 2009).  Where an ambiguity exists, "the construction placed upon the term by the parties themselves as established by their conduct may be examined to determine the term's true meaning." *Hazra Northeast, Inc. v. Lehrer McGovern Bovis, Inc.*, 255 App.Div.2d 935, 680 N.Y.S.2d 379, 380 (4th Dept. 1998).

### A.  The WDF Claim

The foregoing conclusion that the Release was intended to apply only to the AmPad and PUSA Bonds is strongly supported by the parties' conduct in connection

---

[14] Moreover, the nature of the suretyship contract supports Actrade's position that the Release does not cover the Allou Claim at issue.  Surety claims by their very nature involve three parties with contractual relationships that are distinct.  Although the identity of the obligee, Actrade, remained constant throughout, the identity of the principals on the bonds issued by the Sureties differed—Allou, AmPad, and PUSA.  A surety does not have any liability to an obligee such as Actrade except in connection with specific bonds, issued on behalf of specific principals.

with the WDF Proof of Claim.  On September 8, 2003, only about 10 weeks after the

AmPad and PUSA Settlement was approved, Avalon filed a proof of claim in Actrade's

Chapter 11 case asserting a pre-petition claim for an unpaid premium on a bond issued by

the Sureties for another principal, WDF.  This proof of claim was filed only after an

exchange of emails relevant to the issues at bar.  Wiss had apparently inquired of Paul

Weiss about an unpaid commission on a WDF bond.  The Paul Weiss attorney had raised

the issue of the unpaid WDF premium with his client, and he then emailed Wiss as

follows:

> Ron: After receiving your email, I spoke with Rick McCormick and now have the
> complete picture.  Because the amount in question is pre-petition, Actrade cannot
> pay it to you now.  I think the two choices you have are as follows: (x) pursue
> WDF or (y) file a proof of claim (which is due Monday) in the Actrade
> bankruptcy in respect of what you think Actrade owes Avalon.  Please call me to
> discuss this matter further if necessary. (Ex. G-46.)

Five months later, the WDF Proof of Claim was objected to by counsel to the Liquidation

Trustee, who thereafter had a phone conversation with Karen Gilman, the Sureties'

counsel.  He inquired as to how Avalon could file a claim notwithstanding the Release in

the AmPad and PUSA Settlement.  In response, Gilman sent him a copy of the email

message quoted above, without taking issue with the message in any respect.  Thereafter,

the objection to the WDF Proof of Claim was withdrawn, and the WDF claim was

subsequently allowed and paid.

Admittedly, the amount at issue in connection with the WDF Proof of Claim was

small.  The proof of claim was also filed by Avalon in its name, as Gilman noted.[15]

---

[15] Gilman's testimony was that she also told counsel for the Liquidation Trust that the claim was that of
Avalon, not the Sureties.  This, however, would not have excluded the WDF Proof of Claim from the
Release.  Even if the premium had been due to Avalon because it had advanced the premium to Greenwich,
Avalon was merely collecting on account of a premium that it had pre-paid to Greenwich.  As the quoted
language of the Release makes clear, the Release specifically releases claims of Greenwich "and its

However, the foregoing exchange of messages demonstrates that the parties did not treat the matter lightly.  Wiss raised it with Paul Weiss, Paul Weiss took up the issue with the chief executive of its client, and no one who was actually involved in the drafting of the Release gave any thought to the obvious fact that, as counsel for the Liquidation Trustee concluded, the claim would have been barred by a general release.

The Court has previously found that the allowance of the WDF Proof of Claim did not give rise to a judicial estoppel.  However, post-release conduct that is inconsistent with an asserted interpretation of a release may be considered in determining the original intent of the parties.  *See In re Best Payphones*, 2007 WL 3051661 (Bankr. S.D.N.Y Oct. 17, 2007).  This incident constitutes probative evidence that the parties did not view the Release as a bar to claims beyond those relating to the AmPad and PUSA Bonds.

### B.  Delay

Delay in asserting the defense of settlement under a release may also be "powerful evidence" that a party asserting a release defense merely "contrived that theory long after the fact," and that the release does not bar the claims at issue.  *W. Alton Jones Found. v. Chevron U.S.A., Inc.*, 97 F.3d at 34; *see also Consol. Edison, Inc. v. Northeast Utilities*, 332 F. Supp. 2d at 650-51.  Actrade relies on this principle because Wiss was notified of a potential claim on the Allou Bonds in October, 2004, and several times thereafter.  He also communicated with Lambert and Adams about the potential claim between 2004 and the spring of 2009, when Plaintiffs filed their formal complaint.  It is undisputed that the Sureties failed to raise the issue of a release at any point during this period of time, and that they did not raise their release defense until they responded to

successors and assigns," which included Avalon in this instance.  (Defendants' Exhibit G-39, Para. 11.) Thus, the Avalon claim would have been released under the interpretation of the Release now urged by the Sureties.

Plaintiffs' complaint in the spring of 2009, over four years after Wiss was first notified of a potential Allou claim.

The Sureties' delay in raising the issue of Release is inconclusive.  As the Sureties explain, more than a year had passed between the AmPad and PUSA Settlement and the date when Wiss was first notified of the Allou Claim by letter, and approximately three years passed between the Settlement and Actrade's first telephone call.  Wiss' heavy workload, the passage of time, and the absence of an actual claim filed against the Sureties all support his explanation that he had simply forgotten about the Release.  On the other hand, the Sureties' conduct is entirely consistent with the conclusion that the parties never intended the Release to cover the Allou claims.  Although Wiss clearly associated Actrade with allegations of past fraudulent conduct, he never connected this conduct to a release of claims.  The Sureties' failure to raise the issue of release at any stage of this case prior to the filing of the complaint in the above-captioned adversary proceeding, as well as the filing of the WDF Proof of Claim, supports Actrade's position that the parties did not intend to release claims except those related to AmPad and PUSA.

## **CONCLUSION**

The Sureties' Sixth Affirmative Defense of release is stricken.  Actrade may settle an order on three days' notice.  The parties are directed to confer on a schedule for further pretrial proceedings on the other issues raised by the Complaint and the Defendants' affirmative defenses.  All prior discovery deadlines are vacated, and if the parties are not able to agree on a schedule for further proceedings, they should promptly arrange a pretrial conference for such purpose.

Dated: New York, New York
        December 31, 2009

                                    */s/ Allan L. Gropper*
                                    UNITED STATES BANKRUPTCY JUDGE